**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 8, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JORDAN-ARAPAHOE, LLP., a
Colorado limited liability partnership;
JACOB MAZIN COMPANY, INC., a
Colorado corporation,

        Plaintiffs-Appellants,

v.

BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF ARAPAHOE,
COLORADO,

        Defendant-Appellee.
_____

COLORADO COUNTIES, INC.;
BOARD OF COUNTY
COMMISSIONERS OF THE
COUNTY OF BOULDER,
COLORADO,

        Amici Curiae.
.

No. 09-1501

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. Nos. 1:08-CV-02790-PAB-MJW and 1:08-CV-02794-PAB-MJW)**

---

Wayne B. Schroeder, Grimshaw & Harring, P.C., (Jamie N. Cotter, Grimshaw &
Harring, P.C., and John W. Madden III, The Madden Law Firm, with him on the
briefs) Denver, Colorado, for Appellants.

Ronald A. Carl, Assistant County Attorney, (Kathryn L. Schroeder, County Attorney, with him on the brief) Arapahoe County Attorney's Office, Littleton, Colorado, for Appellee.

Beth A. Dickhaus, Hall & Evans, L.L.C., Denver, Colorado, and David Hughes, Deputy County Attorney, Boulder County Attorney's Office, Boulder, Colorado, on brief for Amici Curiae.

---

Before **MURPHY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Jordan-Arapahoe, LLP, and Jacob Mazin Company, Inc. (together Jordan-Arapahoe) own land in Arapahoe County, Colorado that they intended to develop for use as a car dealership and sell to CarMax, Inc. Learning of the planned development, the Arapahoe County Board of County Commissioners rezoned the land, thwarting the sale.

Jordan-Arapahoe sued under 42 U.S.C. § 1983, claiming Arapahoe County's zoning decision deprived it of a protected property interest without due process in violation of the Fourteenth Amendment of the United States Constitution. The district court dismissed the case, reasoning Jordan-Arapahoe had failed to show a protected property interest under Colorado law since its development proposal had not yet become sufficiently final, or vested.

We agree. Under Colorado law a property owner does not obtain a vested property right absent (1) the approval of a site specific development plan, or (2)

the landowner's substantial and detrimental reliance on representations and affirmative actions by the local government. Neither condition was met here.

Having jurisdiction pursuant to 28 U.S.C. § 1291, we therefore AFFIRM the district court's decision.

## I. Facts

Some time prior to 1998, Jordan-Arapahoe, LLP, purchased land in Arapahoe County, Colorado. In 1998 Arapahoe County approved a preliminary development plan (1998 PDP) that rezoned Jordan-Arapahoe's land from agricultural to Mixed Used-Planned Unit Development (MU-PUD). Arapahoe County amended the PDP in 1999 (1999 PDP). Both the 1998 PDP and the 1999 PDP noted "Automotive Sales and Repair" as an allowable use under the MU-PUD zoning.

In September 2002, Jacob Mazin Company, Inc. purchased some of Jordan-Arapahoe's land with the intent to develop an automobile dealership. It never developed the dealership, but Jordan-Arapahoe, relying on both PDPs' provision of "Automotive Sales and Repair" as an allowed use, paid approximately $2.6 million in capital development costs on both its and Jacob Mazin's property for (a) street construction, (b) site preparation and grading, (c) water channel drainage improvements, and (d) sanitary sewer installation in preparation for selling the land to a buyer interested in using it for an automotive dealership.

-3-

In April 2006, Jordan-Arapahoe and Mazin agreed to sell their land to CarMax, which intended to operate a dealership. The contract was contingent upon confirmation that CarMax's intended use of the property was permitted under the zoning regulations.

In May 2006, the city of Centennial asked the County to suspend all applications for development approval of automobile-sales uses at and around the Jordan-Arapahoe property. Arapahoe County complied and imposed a four-week moratorium on all development proposals, prompting a meeting at which the City Manager for Centennial, Jordan-Arapahoe, and CarMax appeared to state their various interests. CarMax advised Arapahoe County it had expended $100,000 to prepare its Final Development Plan. After the meeting, Arapahoe County extended the moratorium to January 2007.

During that moratorium period, in late 2006, against the unanimous recommendation of the Arapahoe County Planning Commission and over Jordan-Arapahoe's objections, Arapahoe County altered the zoning for an area that included Jordan-Arapahoe's property. The rezoning added to the existing zoning regulations an "Overlay District" that superseded portions of the MU-PUD and replaced the PDPs' original 30-foot setback with a 1,500-foot setback for all public rights of way surrounding Jordan-Arapahoe's property. The 1,500-foot setback only applies to automobile or vehicle sales uses and makes it impossible

to build a car dealership on the property, effectively negating Jordan-Arapahoe's contract with CarMax.

Frustrated at not being able to sell its property after developing it for a specific use, Jordan-Arapahoe brought a claim under 42 U.S.C. § 1983 for deprivation of a protected property interest without due process in violation of the Fourteenth Amendment of the United States Constitution. The district court dismissed for failure to state a claim upon which relief can be granted, concluding Jordan-Arapahoe had failed to allege facts sufficient to show they had a protected property interest in the original zoning.

## II. Discussion

Jordan-Arapahoe argues the district court erred in concluding it has no protected property interest under Colorado law. It contends Arapahoe County's zoning classification and conduct created a protected property interest in two ways: (1) Colorado's Vested Property Rights Act (VPRA), COLO. REV. STAT. § 28-68-101, *et seq.* establishes a property right by virtue of Arapahoe County's zoning scheme combined with the County's approval of the preliminary development plan; and (2) Colorado common law establishes vested property rights because Jordan-Arapahoe reasonably relied on Arapahoe County's zoning classification in expending substantial sums developing its property for a car dealership.

The district court rejected both theories. The court concluded neither Colorado statutory nor common law created a vested property right protected under the United States Constitution. We agree with the district court.

We review de novo a district court's dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same legal standard as the district court. *Teigen v. Renfrow*, 511 F.3d 1072, 1078 (10th Cir. 2007). We accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff. *Beedle v. Wilson*, 422 F.3d 1059, 1063 (10th Cir. 2005). To survive a 12(b)(6) motion to dismiss, a plaintiff must allege that "enough factual matter, taken as true, [makes] his 'claim to relief . . . plausible on its face.'" *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the [pleaded] factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009); *see also Gee v. Pacheco*, No. 08-8057, 2010 WL 4909644, at *2–3 (10th Cir. Oct. 26, 2010). As applied here, to state a claim for the deprivation of property without due process, Jordan-Arapahoe must allege facts plausibly suggesting (1) Arapahoe County deprived it of a protected property interest, and (2) such deprivation was arbitrary. *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).

Property rights are protected by the due process clause of the Fourteenth Amendment, which provides, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Property rights we recognize under the Fourteenth Amendment "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972); *see also Federal Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1196 (10th Cir. 1999). And, the "identification of those benefits and the 'legitimate claim of entitlement' to them is determined not by the Constitution, but largely by state law." *Eason v. Bd. of Cnty. Comm'rs*, 70 P.3d 600, 604–05 (Colo. App. 2003) (citing *Hillside Cmty. Church v. Olson*, 58 P.3d 1021, 1025 (Colo. 2002)).

We thus must turn to state law in understanding the scope of property rights in land ownership. This is not always a simple task. The modern understanding of the bundle of sticks of land ownership is overlain with myriad competing land use, zoning, and environmental regulations. A landowner faces numerous restrictions on the full use and alienability of land depending on the interplay of local, state, and federal law. "[T]he right to use property is fully protected by the Due Process Clauses of the federal and state constitutions, but is subject to a proper exercise of the police power." *Id.* at 605.

Zoning is the most prominent police power restriction on land use. Of course, the "economic and social benefits of zoning in crowded modern cities hardly need elaboration" and zoning is considered "essential to the public health, safety and welfare" of communities. 8 EUGENE MCQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS, § 25:2 (3d ed. 2010). Nevertheless, a municipality's power to zone must be balanced against landowners' rights, and in "the municipal land use context . . . the entitlement analysis presents a question of law." *Nichols v. Bd. of Cnty. Comm'rs*, 506 F.3d 962, 970 (10th Cir. 2007).

We have explained generally that a landowner's protected interest in a particular zoning decision depends on "whether there is discretion in the [local zoning authority] to deny a zoning or other application." *Norton v. Vill. of Corrales*, 103 F.3d 928, 931–32 (10th Cir. 1996). "A property interest exists if discretion is limited by the procedures in question, that is, whether the procedures, if followed, require a particular outcome." *Nichols*, 506 F.3d at 970. Accordingly, "where the governing body retains discretion and the outcome of the proceeding is not determined by the particular procedure at issue, no property interest is implicated." *Crown Point I, LLC v. Intermountain Rural Elec. Ass'n*, 319 F.3d 1211, 1217 (10th Cir. 2003). We answer these questions by applying state and local law to the property interest for which protection is claimed.

Jordan-Arapahoe must show, therefore, that under Colorado law Arapahoe County had limited discretion to change the zoning and to disapprove Jordan-

Arapahoe's final development plan. Like the district court, we conclude Jordan-Arapahoe failed to make this showing and thus has not demonstrated a vested property interest protected by federal law.

We address both the statutory and common law theories in reaching this conclusion, which we turn to next.

### A. *Vested Property Rights Act*

Jordan-Arapahoe first contends it has a vested property right under the Vested Property Rights Act. COLO. REV. STAT. § 28-68-101, *et seq.* Specifically, it alleges the VPRA prevents Arapahoe County from changing zoning once it has already approved a preliminary development plan. We find that argument unpersuasive.

Prior to the enactment of the VPRA, Colorado law relied primarily on the common law doctrine of vested rights to determine property owners' rights. But "the uncertainties and complexities of the estoppel and due process analyses of vested rights" often failed to "provide a date certain for the vesting of rights," leaving both landowners and municipalities unsure of their rights. Michael M. Schultz, *Vested Property Rights in Colorado: The Legislature Rushes in Where . . . .*, 66 DEN. U. L. REV. 31, 43 (1988–89) (analyzing the history and reasoning behind the VPRA).

Addressing this uncertainty that left many landowners and potential developers unsure as to when their property rights vested, in 1987 Colorado

enacted the VPRA as a means to provide for a more explicit regulatory framework:

> It is necessary and desirable, as a matter of public policy, to provide for the establishment of vested property rights in order to ensure reasonable certainty, stability, and fairness in the land use planning process and in order to stimulate economic growth, secure the reasonable investment-backed expectations of landowners, and foster cooperation between the public and private sectors in the area of land use planning.

COLO. REV. STAT. § 24-68-101(1)(a).  To achieve that goal, the VPRA provides, "A vested property right shall be deemed established with respect to any property upon the approval, or conditional approval, of a site specific development plan, following notice and public hearing, by the local government in which the property is situated."  COLO. REV. STAT. § 24-68-103(1)(b).  Regarding what qualifies as "approval, or conditional approval, of a site specific development plan," the VPRA places an obligation on local governments to decide:  "Each local government" must "specifically identify, by ordinance or resolution, the types of site specific development plan approvals within the local government's jurisdiction that will cause property rights to vest."  *Id.* at § 24-68-103(1)(a).

To apply the VPRA, we thus turn to Arapahoe County's definition of a protected site specific development plan.  In the Arapahoe County Land Development Code, the County, specifically referencing its VPRA obligation, provides, "[A]n applicant may seek approval of a 'vested property right' either [1] by approval of a 'site specific development plan' or [2] by approval of a

-10-

'development agreement'[1] relating to the proposed development."  Aplt. App. at 89 (Code, § 1-4912.01).

The Code then explains the "following approvals shall be eligible for vesting as 'site specific development plans': [1] Final Development Plans on property that has received final plat approval by the Board of County Commissioners, [2] qualifying Master Development Plans . . . , [3] Administrative Site Plans, or [4] such other plans as the Board may designate in an agreement entered into by the County and the landowner."[2]  *Id.*

Under this provision, Arapahoe County's approval of a final development plan would establish a vested property right pursuant to the VPRA.  To be eligible, a final development plan receives approval through the following procedure:

> In a standard [Planned Unit Development], the development standards are established after the completion of two steps: the Preliminary and Final Development Plans.  The final document must achieve the County's nine stated goals for P.U.D. zoning, and must comply with all other applicable restrictions of the Regulations.  The preliminary development plan ("PDP") establishes general land uses and siting restrictions, including proposed site development criteria.

---

[1]  Jordan-Arapahoe does not assert a development agreement existed, so our analysis depends only on whether Arapahoe County approved a site specific development plan.

[2]  Neither Master Development Plans nor Administrative Site Plans are at issue in this case.  Our analysis hinges on whether Arapahoe County approved a final development plan.

-11-

Aplt. App. at 54 (Code, § 1-4901.09). The Code thus makes clear there is a two-step process before a final development plan receives approval. Subsection 1-4903.01 further clarifies that a preliminary development plan is "the *first step* in establishing land uses and siting restrictions for a parcel of land," while the "*uses, minimums, and maximums provided in the PDP will be reviewed at the Final Development stage to further determine the appropriateness for the particular site and neighborhood.*" Aplt. App. at 58 (Code, § 1-4903.01).

The same subsection then provides, "Once a PDP has been approved, [a final development plan] which complies with the terms, conditions and requirements of the approved PDP must be submitted and approved prior to the issuance of building permits for improvements to any site or sites within the project covered by the PDP." *Id.* Under these provisions, Arapahoe County retains discretion to approve or reject zoning uses until it gives final approval of a final development plan. The Code emphasizes that Arapahoe County makes its final decision regarding zoning uses only during its review of a final development plan, and the plan "must achieve the County's nine stated goals for P.U.D. zoning, and must comply with all other applicable restrictions of the Regulations." *Id.*

Jordan-Arapahoe did not receive approval of a final development plan, and it does not argue otherwise. Confronting this, it contends the Code does not give Arapahoe County discretion to reject a final development plan if the plan is

-12-

consistent with the already-approved PDP.  *See* Reply Br. at 15–17.  It bases this

argument on § 1-4903.02 of the Code, which provides that if a final development

plan proposes substantial criteria changes from a PDP, then applicants may need

to amend the PDP before submitting a final development plan for approval.[3]  Aplt.

App. at 58.  Jordan-Arapahoe contends § 1-4903.02 limits Arapahoe County's

discretion to reject a final development plan if that plan is substantially in

compliance with the already-approved PDP.

But Jordan-Arapahoe misreads the Code.  In no way does it limit Arapahoe

County's discretion to reject a final development plan, even if that plan is

identical to the already approved PDP and even if Arapahoe County has already

approved a final plat.  As explained above, a plain reading of the Code shows it

does just the opposite: The Code explicitly and repeatedly requires that Arapahoe

---

[3]  Section 1-4903.02 of the Code provides,

A Final Development Plan, as defined in the Definitions section of
these regulations, is the second step in establishing approval of land
uses and siting restrictions for a development.  This document
provides specific information on the uses to be permitted and the
manner in which they may be situated on the property.

If the submitted Final Development Plan proposes substantial criteria
changes from those approved on the Preliminary Development Plan,
the applicant may be required to amend the PDP prior to submitting
the Final Development Plan.  The thresholds for determining whether
an Amendment to an approved Preliminary and/or Final Development
Plan can be processed administratively can be found in the
Administrative Amendment section of these regulations.

County must approve the final development plan as the "second step in establishing approval of land uses and siting restrictions for a development." Aplt. App. at 58 (Code, § 1-1903.02). The Code cannot reasonably be construed to strip the County of its second-step authority to approve or reject a final development plan. Nor does the Code contain any limiting criteria flowing from the planning commission's preliminary approval that would undermine the County's discretion at step two. In short, Arapahoe County has discretion under its zoning code to reject or modify proposed developments until it approves a final development plan. At that time, the uses embodied in the plan are vested as contemplated by the VPRA.

Accordingly, the district court did not err in concluding the VPRA, in conjunction with the Code, does not provide Jordan-Arapahoe a vested property right.

### B. Colorado Common Law

Although the VPRA does not provide relief to Jordan-Arapahoe, it is not the only way to obtain a vested property right under Colorado law.

Colorado enacted the VPRA to provide for reasonable "certainty, stability, and fairness" in the land use planning process, but it was not intended to replace existing common law rights. By its own terms the VPRA provides, "Nothing in this article shall preclude judicial determination, based on common law principles, that a vested property right exists in a particular case or that a

-14-

compensable taking has occurred." COLO. REV. STAT. § 24-68-106(3). In other words, the VPRA expands and clarifies the means by which property owners may gain vested property rights. It does not eliminate or restrict existing methods, and any property right created under Colorado common law may satisfy the vesting requirement. Because Jordan-Arapahoe does not have a vested property right under the VPRA, the only question is whether it has one under Colorado common law. We conclude it does not.

To answer this question, a brief review of Colorado property law is helpful. Most commonly, property rights vest in a particular land use after a building permit has been issued and the landowner acts in reliance on it. "A city permit can provide the foundation for a vested right, and thus be constitutionally protected from impairment by subsequent legislation, if the permit holder takes steps in reliance upon the permit." *P-W Investments, Inc. v. City of Westminster*, 655 P.2d 1365, 1371 (Colo. 1982). Indeed, the "general rule . . . provides that a common law right to develop does not vest until the party has taken substantial steps in reliance on a building permit." *Villa at Greeley, Inc. v. Hopper*, 917 P.2d 350, 356 (Colo. App. 1996); *see also Cline v. City of Boulder*, 450 P.2d 335, 338 (Colo. 1969) (reiterating the rule that a building permit by itself, without reliance, is not enough to create a vested property right). Thus, "generally speaking, no preliminary proceedings to the obtaining of a [building] permit give rise to any vested right to pursue a use in a zoned district. Thus, no vested right to a

-15-

particular use in a zoned district is acquired by approval of [a] plan for it." *City of Aspen v. Marshall*, 912 P.2d 56, 60–61 (Colo. 1996).[4]

Without a building permit, therefore, developers who rely only on zoning or approved uses are facing an uphill battle. For many years, Colorado law simply held that developers without a building permit had no "vested common-law development rights as a matter of law." *SK Fin. v. La Plata County. Bd. of Cnty. Comm'rs*, 126 F.3d 1272, 1278 (10th Cir. 1997); *see also P-W Invs, Inc.*, 655 P.2d at 1371; *Crawford v. McLaughlin*, 473 P.2d 725 (Colo. 1970). These cases present a large obstacle to Jordan-Arapahoe since it had yet to obtain a building permit for a car dealership at the time the zoning use was modified.

To overcome this obstacle, Jordan-Arapahoe points to a decision by the Colorado Court of Appeals, claiming Colorado law allows property rights to vest by virtue of a zoning classification and detrimental reliance. *Eason v. Bd. of Cnty. Comm'rs*, 70 P.3d 600 (Colo. App. 2003). In *Eason*, the plaintiff received approval to operate a self-storage business using semi-trailers on his property. *Id.* at 603. After the initial zoning, the county then wrote a letter to the plaintiff saying he could operate his storage business because the land was properly zoned

---

[4] *See also* Christopher Serkin, *Existing Uses and the Limits of Land Use Regulations*, 84 NYU L. REV. 1222, 1238–39 (2009) ("The doctrinal details determining when a right vests are the subject of frequent commentary. . . . Under the vested rights doctrine, then, property rights are subject to a kind of tipping point. Before a right vests, property receives one level of protection. But as soon as an owner has done enough to establish a particular use, the property becomes entitled to much greater protection.").

for such use. *Id.* at 603. The landowner, relying on the county's representations, obtained a building permit (although it is unclear why a permit was necessary) and moved over 100 semi-trailers onto his property. *Id.* After he commenced operations and after his building permit expired, the county changed the zoning and ordered him to remove the semi-trailers. *Id.*

When Eason sued, the Colorado Court of Appeals found he had a vested property right in the use allowed under the prior zoning code. The court explained that Colorado common law allowed a vested property right in two ways. The first way was through a duly issued building permit, as established by cases such as *City of Aspen* and *Cline*. But the court concluded the common law also allowed vesting to occur in a second limited circumstance. If a zoning classification permitted a particular use, and the property owner reasonably and detrimentally relied on an affirmative act or representation by the county about permitted uses in that classification, the property owner obtained a vested property right. *Id.* at 605. "Colorado law recognizes a protected property interest in a zoning classification when a specifically permitted use becomes securely vested by the landowner's substantial actions taken in reliance, to his or her detriment, on representations and affirmative actions by the government." *Id.* at 605–06. The court not surprisingly found this principle had been violated where the landowner relied on (1) final zoning allowing the intended use; (2) an affirmative written representation by the county confirming the intended use; (3)

the issuance of a building permit; and (4) operation of his business for two years. "Eason was told by the government that his use was permitted under its interpretation of the zoning ordinance, and he relied, to his detriment, on that assertion." *Id.* at 606

Relying on *Eason*, Jordan-Arapahoe contends it detrimentally relied on the representations or affirmative actions of Arapahoe County when it developed its property for sale to CarMax. Addressing this argument requires us to determine (1) whether Jordan-Arapahoe pleaded enough facts to show they took substantial action in reliance to their detriment on (2) representations or affirmative actions by Arapahoe County.

Jordan-Arapahoe pleaded in its Complaint enough facts to show detrimental reliance, and Arapahoe County does not argue otherwise. We thus must resolve whether Jordan-Arapahoe relied on a representation or affirmative action by Arapahoe County. Jordan-Arapahoe contends Arapahoe County's approval of the PDP is enough of a representation or affirmative action for rights to vest under *Eason*. But as explained above, the Code makes clear no vested right exists until Arapahoe County approves a final development plan. Thus, approval of the PDP alone cannot qualify as an affirmative action or representation because Jordan-Arapahoe could not have *reasonably relied* on the PDP approval as creating a vested right absent the second-step final approval. Arapahoe County, on the other hand, argues the only affirmative act or representation that will satisfy *Eason* is

-18-

approval of a final development plan pursuant to the procedure set forth in the Code. That position does not follow from *Eason* either, however, because it improperly conflates VPRA requirements with the common law.

As is often the case, we are left with the middle ground. *Eason* plainly requires some affirmative action or representation beyond preliminary approval of a development plan or the mere fact a use is permitted in the zoning classification. Rather, affirmative action or representation may come in the form of a letter, as it did in *Eason*, or some other act or conduct by the relevant authority. But *Eason* does not establish a vested common law property right where zoning is followed by some detrimental reliance only on the zoning classification. If it did, developers could expend money on land for an intended use and lock municipalities into zoning before the municipalities were certain such zoning was in the public's interest.

*Eason* does, however, stand for the principle that once a planned development in a zoning classification is backed by affirmative actions or representations by county officials—such as active acquiescence by word or deed or through some other unequivocal confirmation—then parties who rely on those affirmations will have vested property rights under the common law. But the analysis will be case-by-case and factually intensive. This framework allows counties to issue initial land use regulations that will alert developers of potential investments, see what proposals come forward under those regulations, then

-19-

decide whether they wish to approve those proposals.  In other words, *Eason*'s holding keeps discretion with local governments while simultaneously encouraging developers, landowners, and potential purchasers to seek additional approvals of permitted uses before expending substantial development funds.

Here we see no affirmative representation or other action by the County of the specificity required by *Eason* other than its approval of the preliminary development plan.  That alone is not enough.

We might be at the end of the discussion but for the recent decision in *Moreland Properties, LLC v. City of Thornton*, 559 F. Supp. 2d 1133 (D. Colo. 2008).  In that case, a municipality had published an ordinance listing allowable uses for a property owner's land, among them, the sales of cars and other vehicles.  The property owner's agent confirmed the permitted use with a representative of the local municipality.  *Id.* at 1136–37.  When the property owner attempted to sell his property to CarMax, the local municipality imposed new requirements on the land that made the sale impractical.  *Id.* at 1138–39.  The district court found a vested property right had been established under *Eason.  Id.* at 1147–48.  First, the court found the local municipality had provided an affirmative representation beyond the preliminary development plan.  *Id.*  In the alternative, the court reasoned a "published ordinance listing permitted uses" constituted an affirmative act or representation.  *Id.* at 1147.

Whether the facts in *Moreland* align with ours is not entirely clear, but in any event we disagree the holding is persuasive here. In *Moreland*, for instance, the zoning appears much more akin to approval of a final development plan than to approval of a preliminary plan, leading the court to conclude the county lacked the discretion to deny final approval.[5] Additionally and most critically under *Eason*, the property owner in *Moreland* relied not only on the permitted uses under the zoning classification but also on the local government's confirmation of permitted uses. To the extent the *Moreland* court relied on those facts to reach its conclusion a vested property right had been established, we agree with that outcome. But to the extent *Moreland* concludes a published zoning classification alone is sufficient alone to establish vested property rights, we find the holding conflicts with *Eason*. *Moreland* thus does not alter our conclusion that the zoning scheme here and Arapahoe County's conduct did not create a vested property right to develop a car dealership.

---

[5] Jordan-Arapahoe also points us to *Albuquerque Commons P'ship v. City Council*, 212 P.3d 1122 (N.M. Ct. App. 2009), which found a protected property right under New Mexico common law when a municipality attempted to change an already final zoning scheme. Setting aside the usefulness of New Mexico law to the facts here, *Albuquerque Commons*, combined final zoning with a local government that lacked discretion to change that zoning. *Id.* at 1127, 1130. In another case relied on by Jordan-Arapahoe, *Nasierowski Bros. Inv. Co. v. City of Sterling Heights*, 949 F.2d 890 (6th Cir. 1991), the landowner obtained affirmative representations from the city that he could go forward with a proposed development "as of right." *Id.* at 897.

In sum, Jordan-Arapahoe cannot establish a protected property right under Colorado common law and has thus not stated a claim upon which relief can be granted.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's decision to dismiss the Complaint for failure to state a claim upon which relief can be granted.